firm's assets, for the purpose of concealing his frauds. Of all that, it is quite clear that the bankrupt was wholly innocent and had no knowledge, nor is any negligence imputed to him.

The cases cited of decisions under the act of 1867, to the effect that the keeping of false or improper books by a partner, would bar the discharge of his co-partner, have no application to the present act, for the reason that under the act of 1867, the requirement to keep proper books was absolute and unconditional. Rev. St. § 5110; Bump, Bankr. 712, 726, 727; In re Newman, 2 N. B. R. 302, Fed. Cas. No. 10,175; In re George, 1 Lowell, 409, Fed. Cas. No. 5,325; Coll. Bankr. 168. Under the present act—section 14b (2)—it is necessary that the failure to keep proper books should be "with fraudulent intent to conceal the bankrupt's true financial condition and in contemplation of bankruptcy."

Where there is fraud in partnership transactions within the scope of the partnership, in which each partner acts as the agent or representative of all the co-partners, the fraud of one is usually imputed to all. See Coll. Bankr. (3d Ed.) 201. This principle was applied by the supreme court in the case of Strang v. Bradner, 114 U. S. 555, 5 Sup. Ct. 1038, 29 L. Ed. 248, in holding a discharge insufficient to protect innocent partners from a debt fraudulently incurred by their co-partner.

If in any case fraud can be similarly imputed to an innocent partner on account of the fraud of his co-partner or other agent as respects the false or improper keeping of books of account (see In re Meyers [D. C.] 105 Fed. 353, 354) it can only be in cases where the fraudulent entries or omissions have reference to partnership transactions so as to fall within the general scope of the partner's or agent's authority.

The frauds in the bookkeeping in this case related to transactions of a wholly different character, in which the partner was defrauding his co-partner, as well as his creditors, in reference to transactions wholly outside of the partnership authority.

As the bankrupt cannot be held to be charged with any willful misconduct in regard to the books, either in fact or in law, and the other charges not being sustained, his discharge should be granted.

---

### In re TODD.

(District Court, S. D. New York. May 28, 1901.)

BANKRUPTCY—COLLATERAL REFERENCE—COSTS—STENOGRAPHER'S FEES.

Where a controversy between a trustee and a third person respecting the right to certain property was submitted to a referee, and the claimant was unsuccessful, he may properly be taxed with the costs of the reference, including a reasonable fee for the referee, a docket fee for the trustee's attorney, and the fee of a stenographer employed on application of the trustee, under Bankr. Act 1898, § 38a, cl. 5, not to exceed, however, 10 cents per folio for reporting and transcribing his notes, in the absence of stipulation.

In Bankruptcy. On application for taxation of costs of a reference.

Clarence R. Freeman, for trustee.
Schuyler C. Carlton, for claimant.

BROWN, District Judge. A dispute having arisen between the trustee of the above-named bankrupt and a third person concerning the possession and ownership of the contents of a safe-deposit box, the referee in charge of the case upon a petition filed with him by the trustee, made order that the claimant attend before him to be heard in reference to the right of property and possession' of the contents of the box. The claimant attended by himself and counsel, submitted to the jurisdiction, asked and obtained leave to file proofs and examine witnesses in his own behalf and was heard. After a somewhat lengthy hearing, the referee found in favor of the trustee and entered an order to that effect and directed that the claimant pay the trustee the costs and disbursements of the proceedings to be taxed by the clerk of this court. Request was addressed to the referee to specify any items taxable, to which no answer has been received, but a bill has been presented by the trustee's attorney with items for witnesses, a docket fee of $20, stenographer's bill for minutes $70.80, and referee's per diem charges for examining testimony and preparing his report and the decree.

The rule established by the late Mr. Justice Blatchford in this court, and ever since followed in regard to stenographers' fees was that when not provided for by law, they could not be taxed in any cause, except upon a written stipulation between the attorneys. Such has been the uniform practice in this court, the attorneys usually dividing and paying the expense of taking and transcribing the stenographer's notes and taxing in accordance with the stipulation in favor of the successful party the sums paid by him for his share of the notes.

The bankruptcy act of 1898 contains but a single provision authorizing the employment or payment of stenographers, namely, section 38a (5) which provides that upon the application of the trustee, the referee may authorize the employment of stenographers at the expense of the estate at a compensation not to exceed 10 cents per folio for reporting and transcribing the proceeding.

The authority thus given to the referee, it will be noticed, can only be exercised upon the application of the trustee; the expense is in the first instance a charge against the estate, and it is not to exceed 10 cents per folio.

The above express provision and the absence of any other, prevent imposing any further charge for stenographers' fees or the taxation of any other, except in pursuance of some stipulation made by the parties to the cause.

In the present case there was no such stipulation; but as the stenographer's notes were rendered desirable and the application therefor was in consequence of the claimant's contesting demands and the controversy has been adjudged against the latter, it is proper that this necessary expense to the estate should be taxed against the claimant; and it is therefore allowed to the extent of 10 cents per folio, which is one-half of the bill rendered. There is no author-

ity for taxing for an additional copy of the testimony for the convenience of the court, whether one or two copies have been made.

No mileage can be charged for the travel of witnesses, as there is no affidavit showing their residence or place of business, or the distance necessarily traveled.

As the application in the present case was outside of the ordinary scope of the referee's duties, a reasonable compensation should be allowed him, according to the analogies in federal practice. See Hathaway v. Roach, Fed. Cas. No. 6,213, 2 Woodb. & M. 63, 1 Blatchf. 652; 2 Supp. Rev. St. p. 487, § 21. The payments to him as for "incidental expenses" under general order 26 (32 C. C. A. xxii., 89 Fed. xi.), it is understood were made from time to time as the reference proceeded. In the absence of any further evidence as to his subsequent examination of the testimony and the making up of his report and judging from the testimony and the nature of the report, I allow the taxation of $50 in full for the referee's fees, and also a docket fee of $20 to the successful attorney.

In re SCHMITT.

(District Court, N. D. Ohio, E. D. May 1, 1901.)

CHATTEL MORTGAGES—WITHHOLDING FROM RECORD—OHIO STATUTE.

Under Rev. St. Ohio, § 4150, by which, as construed by the supreme court of the state, a chattel mortgage is absolutely void and inoperative as against creditors of the mortgagor until filed, but on such filing becomes valid and effective, the holder of such a mortgage, withheld from record by agreement for some time after its execution, is not estopped to enforce it after it is filed as against general creditors, who became such in the meantime.

In Bankruptcy. On question certified by referee.

Thos. H. Bushnell, for receiver.
Laubscher & Kees, for Benton, Myers & Co.

WING, District Judge. The question arising in this case is certified by Mr. Harold Remington, referee, for review of order. The facts, in brief, appear to be as follows: That a chattel mortgage was executed and delivered by Schmitt to Benton, Myers & Co. on August 7, 1899, and was filed by the mortgagees in the proper office on November 11, 1899; that the mortgage was given to secure an indebtedness of about $1,200, then past due, and was upon fixtures in the store of Schmitt; that the mortgage was not filed by the mortgagees until the date named, and was withheld from filing at the request of Schmitt, and by agreement between the mortgagor and the mortgagee that it should be so withheld so long as the mortgagor paid $50 per month on his indebtedness; that, after the making and delivery of the said mortgage, and before the filing thereof, Strong, Cobb & Co., an Ohio partnership, from time to time sold and delivered to Schmitt goods and merchandise on credit, and that there is due and unpaid thereon $253.68, and interest from March 28, 1900; that Strong, Cobb & Co. made such